IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

JOSEPH NADEL,

    *Plaintiff*,

  v.

UNITED STATES OF AMERICA,

    *Defendant*.

No. 19-cv-1099-SB

---

Timothy E. Lengkeek, YOUNG CONAWAY STARGATT & TAYLOR LLP, Wilmington, Delaware,

    *Counsel for Plaintiff*.

Dylan J. Steinberg, Shamoor Anis, U.S. ATTORNEY'S OFFICE, Wilmington, Delaware,

    *Counsel for Defendant*.

---

## MEMORANDUM OPINION

December 21, 2020

BIBAS, *Circuit Judge*, sitting by designation.

When Joseph Nadel went to a veterans' hospital in Delaware for an endoscopy, he suffered an injury. So he brought a medical malpractice action against the United States under the Federal Tort Claims Act. Under Delaware's Medical Malpractice Statute, plaintiffs must support each element of their claims with expert medical testimony. Because Nadel's expert's report does not, I will grant summary judgment for the United States.

## I. BACKGROUND

### A. Nadel's procedure

In 2018, Nadel visited the Wilmington Veteran Affairs Medical Center for an upper endoscopy. Compl. ¶¶ 4, 7, D.I. 1; D.I. 4, ¶¶ 4, 7. During the procedure, his doctor discovered an abnormal tangle of blood vessels in his duodenum. D.I. 48; D.I. 50, ex. A. The doctor cauterized it with an Erbe electrosurgery machine that was connected to a Gold Probe manufactured by Boston Scientific. Compl. ¶¶ 9, 11, D.I. 1; D.I. 48, at 5.

After the endoscopy, doctors realized Nadel's duodenum had torn. D.I. 50, at 2. Surgeons at another hospital then took out his gallbladder and patched his duodenum. Compl. ¶¶ 13, 14, D.I. 1; D.I. 48, at 2.

Nadel claims that his injury resulted from the veterans' hospital's negligence. Compl. ¶ 15, D.I. 1. He argues that the settings used on the Erbe machine produced too much voltage and so perforated his duodenum. *Id.*; D.I. 50, at 3.

### B. This suit

Because the veterans' hospital is run by a federal department, Nadel sued the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–80. Compl. ¶¶ 1, 4,

D.I. 1. The Act allows claims against the United States for the negligent acts of its employees acting within the scope of their employment. 28 U.S.C. § 1346(b). Liability depends on the law of the state where the tort took place. *Molzof v. United States*, 502 U.S. 301, 305 (1992).

Nadel's endoscopy took place in Delaware, so Delaware law applies. Delaware's Medical Malpractice Act requires plaintiffs to support their claims with expert medical testimony. *See* 18 Del. C. § 6853(e); *Burkhart v. Davies*, 602 A.2d 56, 59 (Del. 1991). The Government moves for summary judgment, claiming that Nadel's expert report does not satisfy the malpractice statute. D.I. 48, at 1–2.

**C. Nadel's expert report**

Nadel's sole expert, Dr. Todd Eisner, focuses on the voltage allegedly produced by the Erbe machine during the endoscopy. D.I. 48, ex. D. He notes that, according to its manufacturer, the Gold Probe should not be used with more than 250 volts. *Id.* He claims that the settings used on the Erbe electrosurgery machine (effect 2; 20 watts) would have produced 460 volts during the procedure. *Id.* Thus, Dr. Eisner avers that "the standard of care was breached in this case because the generator settings exceeded Boston Scientific's recommendations." *Id.*

Dr. Eisner's understanding that these settings produced 460 volts is based entirely on the testimony of John Day, vice president of Erbe. *Id.* ("According to Mr. Day, the voltage produced by the ERBE machine during the procedure at issue in this case exceeded 250V … ."); D.I. 48, ex. B, at 13.

But Day did *not* testify that the Erbe gave off 460 volts during Nadel's endoscopy. Rather, he said it would produce that voltage at effect 2, 20 watts when tested on a 200-ohm resistor. D.I. 48, ex. C, at 29, 31. And as he explained, the voltage output depends on the level of resistance that the machine meets. *Id.* at 29. So to "know what the voltage would be across a portion of a duodenum," he "would need to know the impedance of the duodenum." *Id.* at 29–30. If the duodenum's resistance was not 200 ohms, then the peak voltage would not necessarily be 460 volts. *Id.* at 30. Day never claimed to know the voltage produced by the Erbe during the endoscopy. *Id.* at 73.

### D. Legal standard

Summary judgment is proper when "there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To resist summary judgment, a plaintiff must "make a showing sufficient to establish the existence of [each essential] element" that he must prove at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Burkhart*, 602 A.2d at 59. A plaintiff's failure to put on proof of an essential element of his case "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. If that happens, the moving party is entitled to judgment as a matter of law. *Id.*

## II. NADEL HAS OFFERED NO EVIDENCE THAT HOSPITAL STAFF DEVIATED FROM THE STANDARD OF MEDICAL CARE

Under Delaware's malpractice statute, 18 Del. C. § 6853(e), a party alleging medical malpractice must produce expert medical testimony that specifies (1) the applicable standard of care; (2) the alleged deviation from that standard; and (3) the causal link between the alleged deviation and the injury. *Green v. Weiner*, 766 A.2d 492, 494–95 (Del. 2001).

4

The Government contends that Nadel's expert fails on all three prongs. Def.'s Mot. Summ. J. 1, D.I. 48. The Government is correct on one point: Dr. Eisner has not adequately specified the alleged deviation from the standard of care. So summary judgment is proper.

### A. Dr. Eisner stated the standard of care

The Government charges Dr. Eisner with failing to articulate the standard of care explicitly enough. D.I. 48, at 7. But experts need not "articulate the standard of care with a high degree of legal precision or with 'magic words.'" *Green*, 766 A.2d at 495. And Dr. Eisner did just enough.

The standard of care, he implied, requires using less than 250 volts. He explained that exceeding 250 volts while using the Gold Probe may injure a patient. D.I. 48, ex. D. And he believed that the Erbe settings during Nadel's procedure produced 460 volts. *Id.* So he claimed that the standard of care was breached "because the generator settings exceeded Boston Scientific's recommendations." *Id.* His report fairly implies that medical staff must use Erbe settings that will not produce too much voltage for the Gold Probe. *See Green*, 766 A.2d at 496. That is a sufficient recitation of the standard of care under Delaware law.

### B. Dr. Eisner failed to identify the deviation from the standard

Dr. Eisner did not, however, show a deviation from that standard. His report relied on Day's testimony to explain that the machine's settings (effect 2; 20 watts) resulted in 460 volts, far more than the 250-volt maximum. D.I. 48, ex. D.

But Dr. Eisner misunderstood Day's testimony. Day claimed only that these settings would result in 460 volts when tested on a 200-ohm resistor. D.I. 48, ex. C, at 29–31. He did not purport to know the resistance of a duodenum, particularly Nadel's duodenum at

the time of the endoscopy. *Id.* at 32, 73. Rather, to determine the relevant voltage output, he would need to do "further testing." *Id.* at 73.

And Dr. Eisner did not testify that the resistance of a human duodenum equaled 200 ohms. D.I. 48, ex. B, at 31–32. At his deposition, he agreed that he had "no idea what the electrical resistance of Mr. Nadel's duodenum on the day of his procedure was." *Id.* at 33.

To be sure, Nadel's evidence of the elements of his negligence claim need not be undisputed. But it must at least be "credible" enough for a reasonable jury to find in his favor. *Green*, 766 A.2d at 495. Dr. Eisner's contention that the hospital staff deviated from the standard of care rests on a misunderstanding. So he has not provided credible evidence of such a deviation. *See Hackman v. Christiana Care Health Servs., Inc.*, 882 A.2d 742, 746 (Del. 2004) (excluding a medical expert's testimony about breach of the standard of care when it relied on a "predicate assumption" with "no factual support").

Nadel points to Dr. Eisner's claim that the Erbe *wattage* was too high for the Gold Probe. D.I. 50, at 3. True, Dr. Eisner's report says that "the standard of care was breached in this case because …. the wattage was too high for this application using the Gold Probe." D.I. 48, ex. D. But at his deposition, he testified that "soft coag, effect 2, *20 watts*" are "the only proper setting[s]" to be used with "the Erbe generator and a Boston Scientific Gold Probe." D.I. 48, ex. B, at 35 (emphasis added). And his report rests on the understanding that the Erbe was set to 20 watts during the procedure. D.I. 48, ex. D. Thus, Dr. Eisner's testimony and report do not support the claim that using 20 watts independently deviated from the standard of care. Rather, his suggestion that the wattage was too high was based

6

entirely on his notion that Day "clearly explained that the ERBE settings during this procedure produced 460V." *Id.* And as explained, this notion was mistaken.

So the only deviation from the standard of care actually alleged is that the Erbe generated excessive *voltage*. This claim has no basis.

* * * * *

Nadel's medical malpractice claim requires expert evidence that the surgeon deviated from the standard of care. Because his expert's evidence on that prong rests on a false premise, he has not proven that essential element of his case. So I will grant summary judgment for the United States.